**In re Thomas A. COX, Debtor.**

**Laurie Davis, Movant,**

**v.**

**Thomas A. Cox, Debtor and William H. Howison, Trustee, Respondents.**

**No. 00–20427.**

United States Bankruptcy Court, D. Maine.

Feb. 22, 2002.

16

Michael J. Pearce, Law Offices of Michael J. Pearce, Portland, ME, for movant.

George J. Marcus, Marcus, Clegg & Mistretta, William H. Howison, Trustee, Portland, ME, for respondents.

### MEMORANDUM OF DECISION

JAMES B. HAINES, JR., Chief Judge.

The matter pending before me on a stipulated record[1] requires harmonizing bankruptcy principles with state property rights, more particularly the property rights of divorcing spouses, insofar as possible.[2]

### Introduction

While a hotly-contested divorce proceeding was pending between Thomas Cox ("Cox") and Laura Davis ("Davis"), Cox voluntarily initiated personal bankruptcy. I granted relief from stay so that Cox and Davis could litigate dissolution-related issues to judgment. In due course, the state divorce court entered its final decree. Per the terms of the order granting relief from stay, the Code's automatic stay remains in effect as to enforcement of that judgment's provisions addressing property division, property disposition, and responsibility for debts.

Davis now seeks relief from the stay to implement the property division components of the divorce decree. She also seeks an order "recognizing and giving full force and effect to," the state court judgment. Cox and the Chapter 7 trustee, William Howison ("Howison"), object. Today, I must address the import of the state court's judgment as it relates to the content of Cox's bankruptcy estate, Cox's exemption rights, Davis's entitlements, and the Code's distributional priorities.

### Background

Cox was a successful commercial lawyer with considerable bankruptcy experience. He has suffered from mental illness since March 1997 and is now totally disabled.

After thirteen years of marriage, including a period of separation, Davis initiated divorce proceedings on November 4, 1998. Divorce litigation was protracted. Cox's first attorney, Pamela Lawrason, withdrew from the case in late 1999. Cox proceeded *pro se* for about two months, then hired new counsel, this time with bankruptcy expertise. After repeatedly threatening bankruptcy, Cox made good on those threats, filing for relief under Chapter 13 on April 5, 2000, the day set for the divorce trial.

On May 30, 2000, Davis obtained limited relief from stay, permitting her to prosecute the divorce action to conclusion in state court. Although the stay relief permitted litigation of all issues within the divorce court's purview, it did not extend

1. The parties have filed an extensive, stipulated record ("Stip.") It is supplemented by a proffer and an objection to the proffer. The issues raised by the proffer and objection are discussed *infra* at Part IV.

2. This memorandum sets forth my findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052 and Fed.R.Civ.P. 52. *See, e.g., De La Cruz v. Cohen (In re Cohen)*, 191 B.R. 599, 604 (D.N.J.1996) (recognizing that facts may be inferred from a stipulated record " 'when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the [stipulated] facts' " (*quoting Universal*

*Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3rd Cir.1981))).

Unless otherwise noted, all citations to statutory sections are to the Bankruptcy Reform Act of 1978, as amended, ("Bankruptcy Code" or "Code"), 11 U.S.C. § 101 *et seq.*

Enumerated adversary rules apply to contested matters. *See* Fed. R. Bankr.P. 9014. Moreover, the parties have agreed to treat this contested matter as an adversary proceeding insofar as the issues joined require determination of their respective rights and interests in property. *See* Fed. R. Bankr.P. 7001(2), (9); Procedural Order dated August 13, 2001, Court Doc. No. 113.

to enforcement of contempt orders or orders relating to property division, asset transfers, debt payment, or debt allocation.[3] Pursuant to the order granting relief, the Chapter 13 trustee entered his appearance in the divorce action to represent the interests of Cox's bankruptcy estate. The bankruptcy case converted to Chapter 7 on October 30, 2000.

On November 21, 2000, the divorce court entered its final decree. Among other things, the decree ordered an equitable distribution of marital property and, in several instances, ordered that certain joint obligations be paid from identified marital assets.[4] Divorce Judgment, Stip. Ex. W. Thereafter, Cox and Davis began litigating whether, and to what extent, further relief from stay should enter to permit execution of the state court judgment's terms. As noted above, the contest extended beyond garden variety relief from stay issues, bringing into question the extent and nature of Davis's rights in specific assets vis-a-vis Cox and the bankruptcy estate.[5]

Although issues regarding real estate have been resolved,[6] there remain deep divides between and among Cox, Davis, and Howison regarding the impact of the post-petition divorce judgment on their rights in bankruptcy. Cox contends that this court cannot permit enforcement of the divorce decree's provisions distributing estate property to unsecured, non-priority creditors (a category which, he asserts, includes Davis) in derogation of his exemption rights and until administrative and priority creditors are satisfied. Davis asserts that the "thoughtful and holistic" (and unappealed) divorce decree, which "gave credit to Mr. Cox for marital assets titled in Ms. Davis's name and credited to [sic] Ms. Davis for marital assets in Mr. Cox's name" is a final determination of the former spouses' rights in identified personal property—and, thus, the content of Cox's bankruptcy estate.

### Discussion

By agreement, the first issue for decision is the respective rights of Cox (and his estate) and Davis in "specific assets, taking into account the status of those rights on the date of bankruptcy and, thereafter, under the final divorce judgment...."[7] The extent of Cox's exemption

3. Order dated May 30, 2000, Court Doc. No. 24; Stip. Ex. U. Issues before the divorce court included child custody and visitation; alimony, maintenance, and support; division of marital property and marital debt; and identification and allocation of separate property and debt. As to bankruptcy issues that might be affected by the divorce judgment, the parties reserved their rights. The order provided that, "relief from stay is not granted to implement any property settlement issues absent further order of this court...." Supplemental orders clarifying the extent of stay relief were entered on July 18 and September 18, 2000. Court Docs. Nos. 38, 58; Stip. Ex. U.

4. It is unnecessary to recite the divorce judgment's provisions chapter and verse. Most of its terms address family law issues (e.g., custody, visitation) in the strictest sense. Insofar

as the judgment's enforcement is challenged on bankruptcy law grounds, its details are elucidated below.

5. See supra note 2.

6. The parties, Howison included, have stipulated that relief from stay may enter to permit implementation of that portion of the judgment awarding real estate on Peaks Island, Maine, to Davis and real estate on Sherman Street in Portland, Maine, to Cox. A separate order has entered in that regard. See Order Granting Motion for Partial Bankruptcy Court Recognition, Ratification, and Approval of State Court Divorce Judgment, Court Doc. No. 124.

7. Procedural Order dated August 13, 2001, Court Doc. No. 113.

rights will be addressed later, if necessary.[8]

The essential legal issue is this: What recognition is accorded as-yet-undeclared marital rights in specific assets when, while a divorce action is pending, one spouse files for bankruptcy relief? The answer is a function of federal law defining the bankruptcy estate's content and of state law limning the character of marital property rights.

At the outset, however, it is necessary to examine the divorce decree provisions that trouble Cox and Howison to ascertain whether they have standing to pursue their arguments.

## I. Challenged Provisions of the Divorce Decree

### A. Cox's contentions

Cox challenges implementation of those divorce decree provisions that order distribution or allocation of property insofar as they do not comply with the Bankruptcy Code's express priorities. More specifically, he asserts that the decree improperly allocates or orders disposition of all or part of two individual retirement accounts, a partnership interest, and funds in two escrow accounts held by divorce counsel. Howison objects to the decree's implementation in other respects. Their concerns are detailed below:

### 1. Advest IRA

The Advest individual retirement account is worth approximately $65,000.00. At bankruptcy, it was held in Cox's name alone. During the course of the divorce proceeding, Cox made several withdrawals from the account, some authorized by the state court, some not. Two withdrawals were made after Cox filed bankruptcy. The divorce court deemed the Advest IRA marital property, and awarded Davis $65,250.00 from it, styling its award as a "sanction" for Cox's violation of divorce court orders (*i.e.*, for repeated transgression of orders prohibiting him from disposing of property without authorization) and because it was "equitable" under the circumstances in light of the value of assets he had wrongfully sold or spent. As a matter of property division, the sanction made Davis whole, as though Cox had not appropriated the assets to his own use in violation of court orders.[9] Cox objects to paying the award out of the account, which he claims as entirely exempt. Cox also objects to the decree's requirement that an outstanding bill for guardian *ad litem* services, in the amount of $10,179.00, be paid from the account (ahead of Davis's $65,250.00 award).

### 2. Fleet IRA

The Fleet individual retirement account, worth approximately $1,500.00 and also held in Cox's sole name at the time of the bankruptcy filing, was awarded to him without an express finding whether it was

**8.** *Id.* The parties have stipulated that Cox's IRA's are "exempt within the meaning of 14 M.R.S.A. § 4422(13)(E)." Stip. ¶ 6. The Maine statute exempts such assets "to the extent reasonably necessary" for the support of a debtor and his or her dependents. To the extent any controversy remains regarding Cox's claimed IRA exemption, it is limited to the *extent* of the exemption only.

Although not germane here, I note that Maine's exemption statute has recently been amended, including its treatment of individual retirement accounts. *See* Public Law 2001, c. 306, § 5 (eff.Sept.21, 2001) (codified as amended at 14 M.R.S.A. § 4422(13)(F)).

**9.** Divorce Judgment, Stip. Ex. W. The judgment was subsequently amended, *see* Order dated February 8, 2001, Stip. Ex. X, but the amendment left the $65,250.00 award intact.

marital or separate property. Cox asserts it is entirely exempt and objects to enforcement of so much of the divorce judgment that requires devotion of funds from the Fleet IRA to satisfy the $65,250.00 award in the event that the Advest IRA is insufficient to do so.

### 3. Amcor Partnership Interest

This asset, held in Cox's name alone, was deemed of negligible value and awarded to him. The court made no finding whether it was marital property or Cox's separate property. Cox objects to enforcement of the divorce judgment insofar as it requires that the partnership interest be sold and applied to the $65,250.00 award if the Advest and Fleet IRA's are insufficient to satisfy it.

### 4. Lawrason Escrow Account

During the divorce litigation, but prior to the bankruptcy filing, the state court ordered that approximately $36,000.00 ($21,000.00 earlier withdrawn from the Advest IRA and $15,000.00 from a lump sum Social Security Disability Income payment) be held by Attorney Lawrason in escrow, principally to assure that tax obligations arising from IRA withdrawals would be paid. Estimating that $10,850.00 was owed to the Internal Revenue Service on account of such withdrawals, the court awarded that sum to Cox for the limited purpose of paying that liability. It ordered that remaining funds from the account be applied to Cox's and Davis's joint federal and state tax obligations for 1985 and 1986 (approximately $10,210.00). And it ordered that any remaining balance be paid to Key Bank on account of the couple's joint mortgage (deficiency) obligation on a vacation home. Cox objects to that portion of the order requiring payment of the Key Bank claim, asserting that it is a

general, unsecured claim against his estate and cannot be paid "out of priority."

### 5. Beagle & Ridge Escrow Account

Another escrow account, established by court order and held by Davis's divorce counsel, consisted of an SSDI lump sum payment for the benefit of the couple's minor children ($6,600.00) and proceeds of the sale of real estate ($1,800.00). The court determined that the former component would remain dedicated to child support and that the latter would be paid toward the couple's joint Key Bank obligation. Cox argues, again, that the state court could not order that Key Bank be paid at variance with the bankruptcy priorities.

### B. Trustee Howison's Contentions

Howison characterizes the $65,250.00 sanction award as, effectively, a property division determination. He does not oppose its implementation. Neither does he contest any allocation of debt responsibility between Cox and Davis. He sees the guardian *ad litem* fee award as a court-ordered cost of divorce litigation and, therefore, takes no issue with its payment, characterizing it as an administrative claim that accrued during Cox's bankruptcy case. Howison does object to the state court's orders requiring that funds from the escrow accounts be used to pay any creditors (tax or otherwise), asserting that distributions to Cox's pre-bankruptcy creditors are controlled by the Code.

### II. *Standing*

We begin at the beginning:

Under the Bankruptcy Code, standing to appeal from a final bankruptcy court order is accorded only to a "person aggrieved." *See In re Thompson (Kowal v. Malkemus)*, 965 F.2d 1136, 1142 n. 9 (1st Cir.1992). The "person aggrieved"

paradigm, which delimits appellate jurisdiction even more stringently than the doctrine of Article III standing, *see, e.g., In re Alpex Computer Corp. (Nintendo Co. v. Patten),* 71 F.3d 353, 357 n. 6 (10th Cir.1995); *In re H.K. Porter Co.(Travelers Ins. Co. v. H.K. Porter Co.),* 45 F.3d 737, 741 (3d Cir.1995), bestows standing only where the challenged order directly and adversely affects an appellant's pecuniary interests. *In re Thompson,* 965 F.2d at 1142 n. 9.

*Spenlinhauer v. O'Donnell,* 261 F.3d 113, 117–18 (1st Cir.2001)(footnote omitted). Although the matter before me is not (yet) on appeal, it follows from *Spenlinhauer's* teaching that in order to have standing to challenge the trustee's position regarding the disposition of non-exempt assets, Cox must demonstrate that the trustee's proposed action "directly and adversely affects" his "pecuniary interests." *See id.* at 118 (lower court's inquiry into standing is "required").

In the Chapter 7 context, a debtor's standing is limited:

> The advent of the chapter 7 estate and the appointment of the chapter 7 trustee divest the chapter 7 debtor of all right, title and interest in nonexempt property of the estate at the commencement of the case. *See* Bankruptcy Code

§§ 541(a), 704; 11 U.S.C. §§ 541(a), 704. Since title to property of the estate no longer resides in the chapter 7 debtor, the debtor typically lacks any pecuniary interest in the chapter 7 trustee's disposition of that property. *See In re El San Juan Hotel,* 809 F.2d 151, 154–55 (1st Cir.1987); *see also In re Cult Awareness Network, Inc. (Cult Awareness Network, Inc. v. Martino),* 151 F.3d 605, 607 (7th Cir.1998); *In re Richman (Richman v. First Woman's Bank),* 104 F.3d 654, 657 (4th Cir.1997).

*Id.* (footnote omitted).

**A. The IRA's**

■ Cox clearly has standing to contest disposition of the two individual retirement accounts. *See, e.g., Owen v. Owen,* 500 U.S. 305, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991)(addressing debtor's challenge to lower court rulings regarding exemption entitlements and lien avoidance).[10] The divorce court judgment required their liquidation and specified how the proceeds, net of tax, should be distributed. Cox contends that the IRA's, exempt at bankruptcy,[11] redound to his benefit alone and cannot be called upon to answer for debts (including Davis's property division claims), other than the limited categories of debts specified in § 522(c).[12] His pecu-

---

**10.** Howison has standing, as well. Insofar as his position is contingent on a finding that the accounts are less than fully exempt, it rests on the contention that the divorce court's order requires payment of pre-petition creditors with estate assets in a manner that would override the Code's system of distributional priority.

**11.** *See In re Bates,* 176 B.R. 104 (Bankr.D.Me.1994)(holding IRA's may come within exemption, "to the extent reasonably necessary for the support of the debtor and any dependent of the debtor," per the statute); *see also supra* note 8 (concerning Cox's entitlement to exemptions).

**12.** Section 522(c) states:

> (c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case, except—
> (1) a debt of a kind specified in section 523(a)(1) or 523(a)(5) of this title;
> (2) a debt secured by a lien that is—
>   (A)(i) not avoided under subsection (f) or (g) of this section or under section 544, 545, 547, 548, 549, or 724(a) of this title; and
>     (ii) not void under section 506(d) of this title; or

niary interest (the value of exempt assets and their limited post-bankruptcy exposure to pre-bankruptcy claims) is bound up in the question whether the divorce court's order requiring substantial invasion of that value (before his exemption claims are honored) controls.

### B. Other Assets

■ Cox also objects to divorce decree provisions affecting other, non-exempt assets. He takes issue with the decree's dictates that the value of the Amcor partnership interest be applied toward the $65,250.00 award, if necessary, and that funds in the escrow accounts be paid over to Key Bank on account of its unsecured claims.

As to these assets, I am unconvinced that Cox has independent standing. Howison, however, does. Although he takes no exception to potential diversion of the Amcor partnership interest's value to satisfy the $65,250.00 award to Davis, he does resist applying any of the funds in escrow to either the Key Bank claim *or* the tax claims.[13]

Since Howison's position covers much the same ground, Cox's potential lack of standing on this point could only reduce the range of issues before me slightly, by eliminating the need to consider whether the value of the Amcor partnership interest must, if necessary, go toward the $65,250.00 award.[14] The Amcor partner-

ship interest's value may be "insubstantial," as the state court concluded. The possibility that it might be called upon to answer for the award appears remote. But I will nevertheless explain the standing issue as it relates to that asset.

In his initial response to Davis's request for enforcement of the divorce decree, Howison reported that he expected there would be insufficient assets to pay priority claims, let alone fund a dividend for general unsecured creditors. His supplemental response sets forth revised figures, indicating that a 10% dividend to unsecured creditors is possible.

Howison's projection demonstrates no likelihood that the estate will yield a surplus distributable to Cox under § 726(a)(6). If issues relating to disposition of the Amcor interest are not pivotal to the existence or extent of such a surplus, it is hard to see how Cox's pecuniary interests are at stake. Thus far, Cox has not taken issue with Howison's projections. He has neither "alleged 'standing' nor adduced any evidence" that the trustee's decision to permit use of the Amcor partnership to pay Davis, if necessary, will harm his pecuniary interest. It is his burden to do so. *Spenlinhauer*, 261 F.3d at 118. I will, therefore, not address Cox's arguments regarding the Amcor partnership interest's disposition unless and until he demonstrates standing.[15]

---

(B) a tax lien, notice of which is properly filed; or
(3) a debt of a kind specified in section 523(a)(4) or 523(a)(6) of this title owed by an institution-affiliated party of an insured depository institution to a Federal depository institutions regulatory agency acting in its capacity as conservator, receiver, or liquidating agent for such institution.
See *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677 (1st Cir.1999).

13. Cox has not objected to the divorce court's requirement that funds from the escrow accounts be used to pay taxes.

14. There is one other, contingent standing concern, discussed *infra* note 28 and accompanying text. I need not confuse the present point by delving into it here.

15. He may do so by demonstrating that the possibility of a surplus turns on the issue, *Spenlinhauer*, 261 F.3d at 119, or by other-

## III. Marital Property Division, Bankruptcy, and Exemptions

### A. Introduction: A Fork in the Road

When it comes to sorting out the substance of the parties' contentions, a cautionary note is warranted. The distance between Cox's position and Davis's (Howison is somewhere in between) is a function of their widely divergent views as to how a non-debtor spouse's inchoate, undeclared marital property rights relate to the bankruptcy estate. One view (Davis's) holds that, when bankruptcy intervenes, the content of the estate cannot be fixed until a divorce-in-progress is sufficiently finalized to provide a declaration of each former spouse's interest in each and all marital assets. The other (Cox's) holds that the estate's content is fixed with the bankruptcy filing and, although a divorce court might go forward to declare divorcing spouses' respective rights, the result is simply a liquidation of claims. Such a liquidation does not alter what the parties' respective rights and interests were at bankruptcy. In other words, the state of title-if you will-of a debtor's assets cannot be altered by a post-bankruptcy divorce decree.

Each view has support in the cases-and each party has bet heavily that its preferred view will win me over. However, the choice is not a subjective one based on how I "feel" about the result. As shown below, the "choice" is wedded, indeed welded, to established state and federal legal principles. Fidelity to those principles demonstrates that any perceived "choice" is, in the final analysis, no choice at all.

### B. Some Bankruptcy Basics

■ When a debtor files a bankruptcy petition, all of his or her property becomes property of a bankruptcy estate. The estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," regardless of where it is located or by whom it is held. § 541(a)(1). "Federal Law provides the general framework for determining what constitutes property of the bankruptcy estate." *In re Southwest Freight Lines, Inc.*, 100 B.R. 551, 554 (D.Kan.1989). "Congress has generally left the determination of property rights *in* the assets of a bankrupt's estate to state law." *Butner v. U.S.*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)(emphasis added).

■ As a rule, the Bankruptcy Code neither creates nor enhances property rights. *See id.* at 55, 99 S.Ct. 914 ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *In re Gull Air, Inc.*, 890 F.2d 1255, 1261–62 (1st Cir.1989); *but see* § 1322(c)(1) and *Schinck v. Stephens (In re Stephens)*, 221 B.R. 290, 293 (Bankr. D.Me.1998) (explaining how Code alters property rights in context of Maine's mort-

---

wise demonstrating his pecuniary interests are "directly and adversely" affected by the trustee's stance. *Id.*

The standing inquiry is factual. *Spenlinhauer*, 261 F.3d at 118; *In re El San Juan Hotel*, 809 F.2d 151, 154 n. 3 (1st Cir.1987). Although it might be considered determinative that Cox has neither alleged standing nor adduced facts to support it in response to the

Chapter 7 trustee's filings, I am concerned that, on the present record, he may not have been alerted to the need to do so and provided an opportunity to address the issue. Should he choose to argue further regarding the Amcor partnership, Cox will be provided an opportunity to proffer evidence of standing, and those opposing him an opportunity to respond.

**24**

gage foreclosure statute).[16] Thus, absent some overriding Code provision (and there is none here),[17] the particulars of Maine law anent the respective rights of divorcing spouses in personal property define the rights of Davis, Cox, and the bankruptcy estate in the case before me.

■ Of course, outside bankruptcy, property rights exist in a dynamic state: They are subject to diminution, enlargement, and appropriation by creditors, through state law processes. In Bankruptcy, through the automatic stay, *see* § 362(a), and the trustee's status as a judgment lien creditor who levies on the debtor's property as of the date the petition is filed, *see* § 544, the Code assures that, after filing, estate property will not be diminished by state processes that otherwise could do so. The estate retains, and the Code preserves, the property interests that belonged to the debtor on the petition date. *Polliard v. Polliard (In re Polliard)*, 152 B.R. 51, 55 (Bankr.W.D.Pa. 1993).

■ The Code "allows the debtor to prevent the distribution of certain property by claiming it as exempt." *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *see* § 522(b); Fed. R. Bankr.P. 4003. An allowed exemption claim removes exempt assets from the estate, preserving them to the debtor for his fresh start. The Code limits their post-bankruptcy exposure to all but a limited number of pre-bankruptcy claims. *See supra* note 12 and accompanying text.

■ The core policies of bankruptcy legislation are to ensure a "fresh start" for deserving debtors and to effect a maximum and equitable distribution (per the statute's priority scheme) to creditors. *See generally Stellwagen v. Clum*, 245 U.S. 605, 617, 38 S.Ct. 215, 62 L.Ed. 507 (1918); *Williams v. United States Fid. & Guar. Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915). Bankruptcy effects the fresh start by treating, and discharging, claims arising before the bankruptcy petition was filed and, in limited circumstances, claims arising thereafter. *See, e.g.,* § 524(a)(discharge of pre-petition obligations); § 365(g)(1)(post-petition rejection of executory contract results in claim for breach as of "immediately before the date of the filing of the petition"); § 348(c)(claims arising post-petition but before conversion treated as pre-petition claims). The Code defines "claim" expansively, *see generally* 2 Lawrence P. King, *Collier on Bankruptcy* ¶ 101.05[1] (15th ed. rev.2001); 1 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 9:4 (1997 & Supp.2001), to assure a broadly effective discharge.[18]

---

**16.** Davis does assert that the *Butner* exception (*i.e.,* that "some federal interest requires a different result") pertains here. That point is discussed *infra* in Part IV.

**17.** Congress has not been unconcerned with the impact of bankruptcy on divorce, but its concern has focused on matters of dischargeability, *e.g.,* § 523(a)(5), § 523(a)(15); distributional priority, *e.g.,* § 507(a)(7), § 726(a)(1), § 1129(a)(9)(B), § 1222(a)(2), § 1322(a)(2); and continuing collection, *e.g.,* § 362(b)(2)(B), § 522(c), § 522(f)(1)(A)(i) & (ii), of divorce-related claims. Among other things, Congress has also addressed sales of jointly-owned and community, property, § 363(h), and has provided a filing fee waiver for "child support creditors" pursuing their rights in bankruptcy, *see* Bankruptcy Court Miscellaneous Fee Schedule, promulgated in accordance with 28 U.S.C. § 1930.

**18.** Section 101(5) of the Bankruptcy Code provides:

(5) "claim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisput-

## C.  Maine Marital Property Rights

Maine's divorce regime is carefully drawn by statute.  And the statutes make it plain that the filing of a divorce complaint, without more, in no way impairs a divorcing spouse's ability to deal with property held in his or her own name.  For example, the owner spouse's title to· real estate is unaffected until the "nonowner spouse," 19–A M.R.S.A. § 953(6) (1998) (spouse claiming a marital interest in property held in the other spouse's name referred to as the nonowner spouse), records the divorce complaint, a clerk's certificate of the complaint, or other qualifying documents in the registry of deeds.  Insofar as personal property is concerned, the nonowner spouse may protect his or her prospective marital property division or award by attachment or trustee process. 19–A M.R.S.A. § 903(5) (1998).

In every divorce action the divorce court's clerk issues a preliminary injunction prohibiting either divorcing spouse from "transferring, encumbering, concealing, selling or otherwise disposing of the property of either or both of the parties, except in the usual course of business or for the necessities of life," without the written consent of the other spouse or court order.  19–A M.R.S.A. § 903(1) (1998 & Supp.2001).  The injunction is enforceable by contempt, by an attorney's fee award, or by other "appropriate processes."  19–A M.R.S.A. § 903(3) (1998).  But although violating such an injunction may invite *personal* liability, nowhere in the statutory scheme is the property's owner deprived of his or her ability to transfer title.

"Marital property" is a term defined in the statute for purposes limited to divorce proceedings;  it does not insinuate itself into the respective property interests of spouses "during the existence of the marriage."  *Zillert v. Zillert*, 395 A.2d 1152, 1155 (Me.1978)(quoting notes to uniform act); 19–A M.R.S.A. § 953(2) (1998). As Maine's Law Court has observed:

> Maine is an equitable distribution state, and not a community property state. One of the principal differences between the two is the nature of the spouse's interest in property to which the other spouse holds legal title.  In a community property state, the spouse acquires a " '*present vested* undivided one-half interest in all property acquired during the existence of the marital relationship' " regardless of the state of title. *Hursey v. Hursey*, 284 S.C. 323, 326 S.E.2d 178, 181 (Ct.App.1985)(quoting *Rodgers v. Rodgers*, 98 A.D.2d 386, 470 N.Y.S.2d 401, 404–05 (1983)).  By contrast, in an equitable distribution state such as Maine, each spouse retains sole interest in property held in his or her name, subject to the right of the other spouse to equitable distribution.

*Salenius v. Salenius*, 654 A.2d 426, 429 (Me.1995)(emphasis in original).  If a divorce judgment has not set the property apart, legal title remains unaffected.  *Id.* Individually-titled assets remain fully available to that spouse's creditors.  *See Szelenyi v. Miller*, 564 A.2d 768, 771 (Me.1989)(creditor of husband could execute judgment against annuity contracts purchased during marriage, but held in husband's individual name).

---

ed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether

or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

## D. Fusion

With the foregoing principles at hand, the interaction of Maine law and federal bankruptcy law will become clearer, providing the signposts directing which fork in the road must be followed.

### 1. The *Palmer* Path

Federal courts regularly face issues arising from an intervening bankruptcy and a pending-but-not-final divorce in "equitable distribution" divorce/property division regimes. Such was the case in *In re Palmer*, 78 B.R. 402 (Bankr.E.D.N.Y. 1987). There, as here, the bankruptcy court was called upon to reconcile the state court's property division powers with bankruptcy principles. It did so as follows:

> [W]hile the adjudication of all rights, duties, and entitlements as between the debtor and the spouse are within the exclusive province of the state matrimonial court, it is within the exclusive province of the bankruptcy court to adjudicate the rights of creditors as against property of the debtor and property of the estate. To the extent that the state matrimonial court adjudicates an equitable distribution in favor of the non-debtor spouse, such award becomes a claim within the context of 11 U.S.C. § 101(9). The non-debtor spouse's claim is an entitlement against the debtor's estate, and thus she becomes one of the general unsecured creditors of the estate.
>
> While the matrimonial court is uniquely qualified to determine the nature and the extent of that entitlement, this court is exclusively authorized to adjudicate the impact of that entitlement upon any property subject to the claims of other creditors of the estate. (11 U.S.C. § 541). Since no equitable distribution award had vested at the time of the filing of the petition, the debtor's prop-

erty came into the estate free of the claims of the spouse. Therefore, the scope of the enforcement of the rights recognized or created by the matrimonial court, to the extent that they affect property of the estate, is the sole and exclusive province of this court.

> Alternatively phrased, the filing of a title 11 case creates an estate whose property rights vest as of the date of the filing of the petition. 11 U.S.C. § 541. Where the spouse's equitable distribution rights vest at some time subsequent thereto, her rights, if any, are subject to the distributions and priorities mandated by the bankruptcy code. *See* 11 U.S.C. § 507. Since the code gives her no right to a distribution of property of the estate superior to that of any other unsecured creditor, the bankruptcy court must supervise her entitlement in order to ensure the equality of distribution mandated by law.

*In re Palmer*, 78 B.R. at 406. Numerous other courts have resolved the issue in similar fashion. *See, e.g., Goldberg v. Hilsen (In re Hilsen)*, 119 B.R. 435, 438 (S.D.N.Y.1990)(affirming lower court's determination that post-bankruptcy judgment dividing marital property merely liquidated nondebtor spouse's unsecured claims against estate property, but remanding for consideration of constructive trust issues); *Perlow v. Perlow*, 128 B.R. 412, 415 (E.D.N.C.1991); *In re Tucker*, 95 B.R. 796, 798 (Bankr.D.Colo.1989); *In re Fisher*, 67 B.R. 666, 668–69 (Bankr.D.Colo. 1986); *accord Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 346 (4th Cir.1992)(bankruptcy court appropriately lifted stay to permit liquidation of divorce-related claims, including claims to marital property, in state court, but retained jurisdiction to determine "allowance of claims against the estate" thereafter); *In re Polliard*, 152 B.R. at 55 (post-petition equita-

ble division of property does not alter bankruptcy estate's rights in property); *In re Becker*, 136 B.R. 113, 118 (Bankr.D.N.J. 1992)(same); *cf. In re Greenwald*, 134 B.R. 729, 731 (Bankr.S.D.N.Y.1991)(where divorce judgment has entered before bankruptcy is filed, nondebtor spouse's declared rights in specific assets made those assets "not property of the estate"); *Moore v. Moore (In re Moore)*, 5 B.R. 67, 68 (Bankr.N.D.Tex.1980)(same).

## 2. The *Perry* Path

■ Davis cites *In re Perry*, 131 B.R. 763 (Bankr.D.Mass.1991), as the preferred analytical paradigm. *Perry* held that when bankruptcy intervenes during the course of a pending divorce, the non-debtor spouse's contingent rights in the debtor's property are not "claims" within the meaning of § 101(5); that they are, therefore, not dischargeable; and that they do not share with other claims in bankruptcy distributions to creditors. *In re Perry*, 131 B.R. at 767. At the same time, however, *Perry* held that the non-debtor spouse's contingent, divorce-based rights "to any portion of the Debtor's property" constitute a "beneficial interest" in assets owned by the debtor, rendering him essentially a constructive trustee. *Id.* at 767–68. The non-debtor spouse's "beneficial property interest" is excluded from the debtor's bankruptcy estate, *id.* at 769,[19] and is immune from a bankruptcy trustee's "strong-arm" avoidance powers, *see* § 544(a).

■ The Sixth Circuit's view, as explained in *White v. White (In re White)*, 851 F.2d 170 (6th Cir.1988), points in the same direction. The *White* court passed on the correctness of the bankruptcy court's grant of stay relief to a non-debtor divorcing spouse so that she might litigate marital dissolution claims to completion in state court. *In re White*, 851 F.2d at 171. The divorce action had been commenced before her husband filed his voluntary, individual Chapter 11 petition. *Id.* The bankruptcy court had considered the case as one of conflicting jurisdiction: its own *in rem* jurisdiction over the bankruptcy estate v. the state court's *in rem* jurisdiction over the marital estate. *Id.* at 172. Although the Sixth Circuit disagreed with the bankruptcy court's jurisdictional analysis, it affirmed the decision to grant relief from stay. The court explained that the "Bankruptcy Code does not define a debtor's interest in property; the answer to that question must be made after reference to state law." *Id.* at 173. It observed:

> We find no error, therefore, in the reasoning of [Bankruptcy] Judge Bodoh that, "[U]ntil the Court of Common Pleas for Ashtabula County, Ohio, makes a specific determination of the property rights as between the Debtor and his spouse, what is property of the Debtor's estate in this cause is unclear, and the reorganization of Debtor's business cannot proceed in an orderly fashion." The bankruptcy judge proceeded to lift the stay so that the state court might "determine the substantive rights of the parties under applicable, non-bankruptcy domestic relations law and to allow the parties to reach, or the state court to impose, a property settlement based on the state court's inquiry into the need for support and other factors under state law." At the same time, the bankruptcy court indicated its "exclusive

---

19. The point follows from a reading of § 541(a)(1). Since the estate is comprised of "all legal or equitable interests" of the debtor in property, it must exclude equitable interests of others in property ostensibly (legally) owned by the debtor. *See, e.g., In re Reider*, 177 B.R. 412, 418–19 (Bankr.D.Me.1994)(final, pre-bankruptcy, divorce judgment created constructive trust in fire insurance policy proceeds otherwise payable to debtor.)

jurisdiction over property of the Debtor ... when the state court defines what is the property of the Debtor."

*Id.* at 174. The *White* holding has led to the view that, when a divorce action is pending before bankruptcy is filed, "the law in the Sixth Circuit is clear that the definition of the debtor's interest in property must be made after reference to state law. Until the state court classifies and equitably divides the marital property, what is property of the bankruptcy estate is unclear." *Hohenberg v. Hohenberg (In re Hohenberg)*, 143 B.R. 480, 485 (Bankr. W.D.Tenn.1992) (citations omitted).[20]

### 3. The "Chosen" Path

▆▆▆▆ Unhappily for Davis, *Perry* cannot control today's decision. To begin, under *Butner*, its holding is tied to Massachusetts law. And whether or not *Perry's* reading of that law is accurate, it is a reading that does not square with Maine law. If a divorcing spouse's contingent rights to a distribution of marital property from assets held in the other's name can be protected by attachment, *see* 19–A M.R.S.A. § 903(5), it follows they are un-

protected without it (or its functional equivalent); if an executing creditor can reach property held in one spouse's name, notwithstanding the possibility that the other spouse might someday be adjudged entitled to a share of that asset as marital property, *Szelenyi v. Miller*, 564 A.2d at 771, Maine marital rights are unrealized until declared; if the pendency of divorce proceedings does not, of itself, disable a spouse from dealing with property held in his or her name, *see* 19–A M.R.S.A. § 953(6), it simply cannot be that a Maine non-debtor spouse's unsecured, undeclared rights to a potential marital property distribution trump the estate's rights at bankruptcy.[21]

▆▆▆▆ That *Perry* necessarily rests on Massachusetts state law principles is enough to distinguish it, but it must be said that *Perry* exhibits a deficiency in its bankruptcy law analysis, as well. Its conclusion that unsatisfied divorce-sourced marital property rights obligations (or, for that matter, potential obligations) are not "claims" and not subject to discharge is belied by the 1994 enactment of § 523(a)(15).[22] That section now provides

**20.** *Hohenberg* quoted the *White* court's observation that:

It is appropriate for bankruptcy courts to avoid invasions into family law matters "out of consideration of court economy, judicial restraint, and deference to our state court brethren and their established expertise in such matters."

*In re Hohenberg*, 143 B.R. at 485 (quoting *In re MacDonald*, 755 F.2d 715, 717 (9th Cir. 1985)).

**21.** My conclusion is pinned to the nature of pre-divorce judgment marital property rights under Maine law, not to operation of a bankruptcy trustee's avoiding powers under § 544(a)(1). *Perry* correctly points out that those avoiding powers belong to the trustee, not to the debtor. *In re Perry*, 131 B.R. at 769. But the point here is that, at bankruptcy, Davis possessed no cognizable interest in specific personal property owned by Cox.

Avoidance is beside the point where there is nothing to avoid.

**22.** *Perry's* point regarding the definition of claim was a federal law determination, but, again, was pinned to the nature of divorcing spouses' rights under Massachusetts law. Without belaboring the point, its analysis there is strained, as well. The *Perry* court cited Mass. Ann. Laws ch. 208, § 34 (Law.Co-op.1991), the statutory provision governing alimony. *In re Perry*, 131 B.R. at 765. The provision recognizes property division as a factor in equalizing otherwise potentially disparate treatment of a needy party. From there *Perry* reasons that as yet undeclared property division obligations translate to the equivalent of specific performance obligations to convey specific marital assets, and asserts that such an obligation, unsatisfied at bankruptcy, *id.* at 767, would not be "for breach of performance" so as to come within the defini-

an exception to discharge for such (unsecured) claims in certain circumstances. *See, e.g., Brasslett v. Brasslett (In re Brasslett)*, 233 B.R. 177, 182–87 (Bankr.D.Me. 1999). Congress recognized that before § 523(a)(15)'s addition to the Code, such obligations were routinely discharged. *See, e.g., Macy v. Macy*, 114 F.3d 1, 3 (1st Cir.1997)(quoting legislative history). Moreover, *Perry's* logical import is that the non-debtor spouse's rights are weightier, and survive bankruptcy more readily (as some character of *in rem* claim, escaping § 523(a)(15)'s rigors) *before* they are determined and declared by a divorce decree than they are *after* the decree is entered. The *Perry* result is at odds with both the Code's scheme and Maine law.

*White's* analysis fails to scrutinize the content of pertinent state law, a step that was fundamentally required for it to reach the sweeping conclusions it reached.[23] If under Ohio law, the filing of a divorce complaint, by itself, did not *disable* one spouse from dealing with his or her property, or his or her creditors from seizing it, how could it be that the content of the bankruptcy estate could not be determined until the state court spoke? After all, it is fundamental that the content of the bankruptcy estate is determined *as of the date the bankruptcy case is commenced.* § 541(a).[24] The Sixth Circuit's approach is flawed. It cannot be applied in conjunction with a principled reading of the Bankruptcy Code and Maine law.[25]

tion of claim set forth in § 101(5)(B). The problem may be one of timing, but it is real. If a *divorced* spouse has defaulted on an obligation to satisfy property division obligations at bankruptcy, there most certainly is a "breach of performance." (If the obligation is to convey a specific asset, one could expect that the divorce decree, properly recorded, could secure that obligation.) But when a *divorcing* spouse's rights to specific assets are as yet undeclared when bankruptcy intervenes, and when a determination of those rights depends on an as-yet unaccomplished statutorily-directed analysis that takes account of monetary awards, it is less than obvious that the non-debtor spouse's "rights" are so specific and elevated as to escape classification as a claim in bankruptcy.

23. Given that *White* merely passed on the propriety of granting stay relief, it was unnecessary to examine Ohio law closely. It could have concluded, as the parties to this case did, that it was sensible for the divorce court to decide all dissolution issues, reserving issues regarding the significance of those decisions in the bankruptcy context. But *White* went much, much further.

24. Section 541(a) provides that the commencement of a case under §§ 301, 302, or 303 creates the estate. Because the bulk of the estate is comprised of the debtor's property interests as of the commencement of the case, the time of the commencement of the

case will be the primary factor in determining what property constitutes estate property.

3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 51:3 at 51–9 (1997).

25. An "unpublished" Fourth Circuit opinion, *Roberge v. Buis*, 1996 WL 482686 (4th Cir. Aug. 27, 1996), presents another twist. Putting aside the question how, if the opinion is unpublished, I could even learn of it or, if so, why I should pay attention to it, *see, e.g.*, 1st Cir. Interim Loc. R. 36(b)(2)(F) (making clear that despite West Group's recent decision to publish unpublished appellate court opinions in a new volume called the Federal Appendix, in the First Circuit Court of Appeals unpublished opinions may still be cited in related cases only), the court there affirmed granting relief from stay to permit a non-debtor spouse to litigate her interest in entireties property in Florida state court, notwithstanding the intervention of her former spouse's bankruptcy filing. *Roberge* incorporates some analysis akin to *White*. *Roberge*, 1996 WL 482686, at *2 ("Because the extent of each spouse's interest ... turns on Florida law, the question of their respective interests is best determined by a court of that state.") (citing *Butner v. United States*, 440 U.S. at 54–55, 99 S.Ct. 914). And it adheres to the principle of "deference" to state courts in domestic relations matters. *Id.* But, again, in passing on the relief from stay issue, the court was not required to evaluate the substantive content of

The *Palmer* path follows straightforwardly from Maine law and §§ 541(a) and 522. It is consistent with the majority of decisions that have addressed such issues in bankruptcies where pertinent state law resembles Maine's. In analyzing the parties' positions with regard to specific assets, it is the path I will follow.

### E. Further on Down the Road

To reach today's destination, I must address the parties' contentions regarding the IRA's, considering the guardian *ad litem* award and considering where Davis's interests rest assuming that the $65,250.00

Florida law except superficially. *Id.* at *1 ("in a Florida equitable distribution proceeding, Kay Roberge *could possibly* receive anywhere from 50% to 100% of the home.") (emphasis added). Although the court assumed that the non-debtor spouse would retain, and the estate would not include, the portion of the home awarded to her by the state court, that issue was not before it. If it were, one would have to assume that the court would go beyond a passing reference to the effect that "equity dictates" the result, *id.* at *2, and examine pertinent statutory and case law authorities in the course of its analysis. Finally, it must be said that the *Roberge* holding was fueled by the court's perception that the debtor spouse had manipulated jurisdiction among Virginia, Florida, and the bankruptcy court unfairly, to his "elderly ex-spouse['s]" prejudice. *Id.*

26. The state court judge explained the award in the following terms:

The Court finds it equitable that Laurie Cox be awarded $65,250 from the Advest account. In so doing the Court recognizes that Thomas Cox, in violation of the preliminary injunction, took funds from the Advest IRA account and sold certain items of marital personal property, property that otherwise would have been available for disposition. Specifically, he withdrew from the Advest account $25,000 for the purchase of the Sheridan Street property, and twice withdrew $2,000 to pay various expenses, including materials for repair of his garage and payment of medical bills. The withdrawal of this $29,000 total was done without Plaintiff's agreement and without a Court order authorizing the withdrawals. In

award was either (1) a compensatory sanction for contempt, or (2) a property division award. Rights and relations pertinent to other assets will be discussed thereafter.

#### 1. The $65,250 Award

Ostensibly, the state court awarded Davis $65,250.00 from the Advest IRA, and from other sources as necessary, as a sanction for contempt. In doing so, however, it expressly took account of how Cox's contumacious conduct affected Davis. It fashioned the sanction to make Davis whole.[26]

addition to selling off books, a stamp collection worth $3,500 and a wooden chest which were marital assets, Defendant sold to a close friend of his a boat valued at approximately $8,000, also a marital asset. These sales took place in the absence of Plaintiff's agreement or a Court order authorizing such.

Although Defendant claims he needed the funds to meet the necessities of life, the Court finds that the use to which he put the withdrawn Advest funds encompassed new home furnishings and home renovations, expenses which do not fall under the rubric of the necessities of life. Defendant did not provide an accounting of the funds taken from the Advest account or the funds gleaned from the sale of marital assets, and the Court is not persuaded that his taking of marital assets in contravention of the preliminary injunction was justified.

The Court therefore finds Defendant in contempt for violation of the preliminary injunction, sanction for which is appropriately the award to Plaintiff of $65,250 of the Advest account balance after payment of the Guardian's fees. Defendant's unlawful invasion of the Advest account reduced the balance by $29,000. By way of a Court order Defendant was given use of an additional $10,000 from that IRA for payment of his attorney's fees. Defendant's sale of items of personal property, most significantly the boat, in violation of the preliminary injunction further depleted the marital estate by approximately $12,000. As a result, Plaintiff was deprived of access to at least one-half of these funds, or $25,500. Awarding this amount to her in addition to her one-half the account balance after paying

To be thorough, therefore, I will analyze Davis's claim to $65,250.00 from the IRA's under each of the two possible characterizations.

### a. A Sanction for Contempt

■■ Cox argues that, as a sanction imposed by the state court for pre-petition conduct, the award must be treated as a pre-petition claim, subject to discharge.[27] A close review of the state court record reveals, however, that although a substantial portion of his contumacious conduct occurred pre-petition, the award was also based on several post-petition actions. Two withdrawals from the Advest account ($2,000.00 each time) occurred after his April 5, 2000, bankruptcy filing. Although there is, therefore, room for argument that some portion of the award could escape discharge (as a post-petition claim), that issue is, for now, beside the point.

The pending question is whether the IRA's, if exempt, *must* answer for the sanction award before taking account of Cox's exemption claim. I conclude that they must not. The IRA's were not impressed with a lien in favor of such an award when Cox's bankruptcy case commenced. As unencumbered assets, if they were fully exempt, the sanction award cannot make a call upon them. *See*

§ 522(c)(2)(exempt assets remain subject to unavoided liens). And, as to a sanction, none of the other § 522(c) debt categories for which exempt assets may be appropriated applies.

If Cox's exemption claim cannot hold in full, Cox might contest Howison's position that the sanction award might be entitled to priority as an administrative claim.[28] His standing to do so would have to based on a contention that diversion of assets available to pay other administrative claims to the sanction award would impair Cox's fresh start by reducing payments to otherwise non-dischargeable administrative claims (*i.e.*, tax claims). The parties have agreed to address the extent of Cox's exemption rights another day, but it must be said that, as the record presently appears, it seems unlikely that his attempt to exempt the IRA funds will fail.[29] As a consequence, I will put the issue aside unless and until Cox's claim to exemption for the entirety of the IRA's is defeated.

### b. Property Division

■■ At bankruptcy, the IRA's stood in Cox's name. Although divorce was pending, and the potential for an equitable division of property existed, it had not yet occurred. Under those circumstances, the

---

the Guardian's fee ($90,000 − $10,500 x ½ = $39,750) restores Plaintiff to the position she would have enjoyed had Defendant not put these funds to his own use.
Divorce Judgment, Stip. Ex. W, at 12–13.

**27.** The question whether a contempt sanction may be excepted from discharge under § 523(a)(6), *see, e.g., Siemer v. Nangle (In re Nangle),* 274 F.3d 481, 484 (8th Cir.2001), or some other Code provision is not before me.

**28.** The basis for considering the sanction an administrative expense is, at best, unclear. Perhaps it could be characterized as an "actual, necessary cost[ ][or] expense[ ] of preserving the estate," § 503(b)(1)(A), because it was

incurred in the course of litigation sorting out Cox's and Davis's claims and interests. But, given the unilateral, volitional nature of Cox's post-petition offenses against state court orders, that seems a stretch.

**29.** As the pertinent provision of Maine's exemption statute, quoted *supra* note 8, provides, the exemption for IRA's operates not only for the support of the debtor, but also for his or her dependents' support. Section 522(c)(1) permits post-bankruptcy resort to exempt assets to pay support obligations. The "reasonably necessary" needs of Cox and his family would seem to be substantial. *See infra* note 35 (remarks of Case Management Officer Kennedy).

IRA's came into the bankruptcy estate free of Davis's putative interests and could be "exempted out" for Cox's benefit. Thus, construing the $65,520 award as a property division provision,[30] as opposed to a sanction, does not aid Davis's case.

### 2. IRA's v. Guardian Ad Litem Fees

▮▮▮ Cox objects to the state court's order that $10,500.00 "off the top" of the Advest IRA be paid to his children's guardian *ad litem* for her fees. With no trouble, I reject his contention. Albeit in another context, *Heintz v. Tremblay (In re Tremblay)*, 162 B.R. 60, 62 (Bankr.D.Me. 1993), held that a debtor's court-ordered responsibility to pay his children's guardian *ad litem's* attorney's fees was a support obligation, excepted from discharge under § 523(a)(5). *Cf. Turner v. Whitney (In re Whitney)*, 265 B.R. 1, 2–3 (Bankr.D.Me.2001)(citing *In re Tremblay* with approval). The Code expressly provides that such obligations can be collected from exempt assets. § 522(c)(1). Relief from stay will enter to enforce this portion of the divorce decree.[31]

### 3. The Escrowed Funds

▮▮▮ The parties have stipulated as follows:

7. During the divorce, the state court ordered the parties' divorce attorneys, Marty Ridge (for Ms. Davis) and Pamela Lawrason (for Mr. Cox), to escrow monies with their firms, Beagle & Ridge and Ms. Lawrason's office. Those accounts are referred to as the "Beagle and Ridge Account" and the "Lawrason Account."

\* \* \*

14. On May 24, 1999, Case Management Officer, John David Kennedy of the Maine District Court, signed and caused to be entered a "Decision and Interim Order" (mistakenly dated May 24, 1998)(the "Kennedy Order"), . . . .

\* \* \*

16. Pursuant to the aforesaid Kennedy Order, Pamela Knowles Lawrason filed with the Maine District Court an accounting of funds held by her in the Lawrason Account dated November 10, 1999. . . . Those funds remain held by Ms. Lawrason in her account. The current approximate balance is $38,000. Also pursuant to said Order, Martin Ridge, Esq.[,] filed an accounting to the court on November 10, 1999. . . .

**Stipulation Of Facts On Motion Of Laurie Davis For Relief From Stay And Order Recognizing Divorce Judgment And Upon The Exempt Status Of Certain Of The Debtor's Property, Court Doc. No. 112.**

▮▮▮ Again, the *Butner* principle applies. Whether property is or is not property of the estate is a federal law question,

---

**30.** The question whether such an obligation might escape discharge under § 523(a)(15) is not before me.

**31.** I realize the parties have not litigated whether the guardian's fee award is "in the nature of support" in the context of this case. The writing on the wall is plain enough, however, to satisfy me that relief from stay is appropriate. *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30–31 (1st Cir.1994)(discussing scope of relief from stay proceedings). Given that the state court has

concurrent jurisdiction to hear § 523(a)(5) litigation and that such a non-dischargeability claim is not time-barred, granting relief from stay will not prejudice Cox's right to argue that, for some conceivable reason, his obligation to pay the guardian's fees does not come within § 523(a)(5) and, therefore, § 522(c)(1). His only limitation in that regard (in my view a substantial one) would be a product of Fed. R. Bankr.P. 9011 or Me. R. Civ. P. 11 (should he contest it in state court).

but the extent of the debtor's (*i.e.*, the estate's) interest in the property, here escrowed funds, is determined by state law. *See, e.g., McCarthy, Johnson, & Miller v. North Bay Plumbing, Inc. (In re Pettit)*, 217 F.3d 1072, 1078 (9th Cir.2000); *In re Carousel Int'l Corp.*, 89 F.3d 359, 362 (7th Cir.1996); *Turner v. Burton (In re Turner)*, 29 B.R. 628, 630 (Bankr.D.Me.1983).

The state court order for escrow of funds held by Lawrason and Ridge operated, effectively, as an attachment of those funds. *Cf.* Me. R. Civ. P. 4A; *Union Trust v. MacQuinn–Tweedie*, 2001 ME 43, ¶ 5, 767 A.2d 289 (attaching creditor has interest in property attached). It placed the funds *in custodia legis*, thereby securing Davis's claim, pending entry of the divorce decree, in respect of any entitlement the divorce court might order. *See Cobb v. Camden Savings Bank*, 106 Me. 178, 76 A. 667, 669 (1909); *cf., e.g.,* 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 52:20 (1997 & Supp.2001).

Thus, on and after May 24, 1999, the funds held by the parties' respective divorce attorneys were impounded by court order. Unlike the IRA's and personal effects in his possession, which Cox had the ability (rightly or wrongly) to dispose of and which his creditors had the right to seize, Cox was effectively disabled from doing as he wished with the escrowed funds. As of the petition date, his only interest in those funds was a contingent one, depending on the divorce court's determinations regarding their disposition.[32]

Accordingly, I conclude that Davis's rights, including her right to benefit by distributing the escrowed sums in accordance with the final divorce decree, are superior to the rights of the estate in those funds. Honoring the state court's orders with regard to the escrowed funds does not effect an out-of-priority distribution of estate assets to otherwise unsecured, non-priority creditors for two reasons. First, any interest the estate held in the funds was subject to the unchallenged pre-bankruptcy court order for escrow. Second, the distribution is in respect of Davis's rights, which coincidentally benefit the affected creditors (taxing authorities, Key Bank, and the couple's children) rather than the rights of the creditors themselves. Relief from stay will enter to permit execution of the state court judgment ordering distribution of the escrowed funds.

## IV.  *The Proffer*

■ In addition to the foregoing asset-specific and order-specific arguments, Davis has proffered evidence which, in her view, militates enforcing the divorce judgment in all its details.[33] Briefly summarized, the substance of the proffer, which includes deposition transcripts, affidavits, and authenticated documents, is this: Through the course of divorce litigation, Cox disobeyed court orders and was generally difficult and obstructive. He reneged on at least one settlement agreement. During negotiations he and his attorneys asserted, sometimes impolitely, that in the absence of an acceptable settlement Cox would file bankruptcy. He

---

32. No party contests the validity of the divorce court's order, and no party asserts that the court-ordered escrow arrangement was imperfectly achieved so as to render the funds accessible to either Cox or his creditors.

   To date, Howison, as trustee, has not sought to avoid such interest as may have been transferred to Davis under the order under any available theory, including, *e.g.*, preference or fraudulent transfer. *See* §§ 547, 548.

33. Offer of Proof, dated August 17, 2001, Court Doc. No. 114.

did so at the eleventh hour and, having done so, now stands to "gain unfairly."

Significantly, Davis did not move to dismiss Cox's Chapter 13 case as a "bad faith filing." *Cf., e.g., Casse v. Key Bank, N.A. (In re Casse),* 198 F.3d 327 (2nd Cir.1999)(discussing "bad faith" dismissal of Chapter 13 case); *Leavitt v. Soto (In re Leavitt),* 171 F.3d 1219 (9th Cir. 1999)(same); *Keach v. Boyajian (In re Keach),* 243 B.R. 851 (1st Cir. BAP 2000) (discussing bad faith in the context of chapter 13 plan confirmation and § 1325). And, although she complains that Cox has been less than thorough and honest in his disclosure of assets, she has not invoked remedies appropriate to such transgressions. *E.g.,* § 727(a). For that matter,

neither has either of the trustees who has served in the case.

Moreover, a cursory review of Cox's schedules and statements confirms that, although filing bankruptcy may have provided him advantages in his dealings with Davis, at the time he filed his petition Cox had other, significant financial difficulties (*e.g.,* post-foreclosure deficiencies, medical bills, and tax obligations) that more than justify his seeking bankruptcy relief.[34]

That Cox (and Davis) were in dire financial straights was obvious to the Maine District Court's Case Management Officer early on. The handwriting was on the wall, and possibility of Cox's bankruptcy was foreseeable, if not predictable, well before it became a *fait accompli.*[35]

---

**34.** *See* Stip. Exs. Q–3, Q–4 (copies of claims register and bankruptcy schedules and statements).

**35.** Observations in Kennedy's May 24, 1999, order include:

Mr. Cox was previously employed as a partner in two of the state's most prestigious law firms. He formerly made at least $ 200,000 per year as an attorney, and had historic highs of almost $ 300,000 per year. He has been disabled since March 11, 1997, and has a Bi-polar II diagnosis. He testified that he has no current ability to work as an attorney on any basis, and that he has no ability to hold any kind of regular full time employment. He receives $8690.00 per month in disability benefits from private disability insurance. Unfortunately, his coverage is due to expire, with the final check to be received on June 11. He is applying for Social Security Disability, but there is little expectation that benefits will begin within 6 months, and a more likely estimate, even if the application is ultimately successful, is for benefits in 12 to 18 months.

\* \* \*

Mr. Cox has no evident source of immediate income once the disability insurance expires. Once that insurance terminates, Ms. Cox [Davis] has no evident source of income beyond her current $ 16,000 per year, although her family has assisted her with informal loans, and there are indications that these may continue.

Both parties testified almost identically when asked what will happen when the disability insurance runs out. Ms. Cox [Davis] said, "I don't know." Mr. Cox said, "I don't know what I'm going to do." As is unfortunately often true in these cases, I find that both parties have failed to fully accept the reality and scope of the looming catastrophe which *will* occur when those benefits expire. I must say it plainly—once the disability insurance terminates, the parties will then consume their remaining IRA assets, quickly or slowly, and thereafter experience, *at best,* a collective standard of living, however allocated between the parties, that is about 20 to 25% of what they have been used to. *At worst,* if things remain as they are today, their collective income will be 12.5% of their former average income. So near as I can tell, Ms. Cox [Davis] has made no significant moves to begin to adjust to this new condition, and Mr. Cox's moves, though well intentioned, have not realized tangible results to date.

\* \* \*

I must observe that the level of legal effort generated by this case would be appropriate and affordable if Mr. Cox still made $200,000 per year. I cannot force the parties to come to agreement, nor can I force them to be successful in alternative and less expensive forums for resolution. I can only warn, and hope that the parties will heed my warning, that if this case continues on its current tra-

I realize that some courts, including several federal courts of appeal, hold the view that one spouse's invocation of bankruptcy to tip the scales (of negotiation or substantive law) in his or her favor during (or following) divorce is repugnant. *See, e.g., In re White*, 851 F.2d 170; *Roberge v. Buis*, 1996 WL 482686. The district court in *Roberge* went so far as to say that *Butner's* exception (that bankruptcy law's adherence to state law does not operate where "some federal interest requires a different result") applies where the federal interest is in "not having bankruptcy used as a weapon in divorce proceedings." *Roberge v. Roberge (In re Roberge)*, 188 B.R. 366, 370 (E.D.Va.1995), *aff'd*, 1996 WL 482686.[36]

I must question *Roberge's* premise if it means that there is something generally impermissible about invoking bankruptcy while divorce pends or where a divorce decree's provisions might be blunted in a way that "advantages" a debtor.[37] The Code is replete with *legislatively created* provisions whereby Congress considered bankruptcy's effects and sought to balance debtors' (and creditors') interests with a divorced-or-divorcing nondebtor spouse's interests and state regulation of marriage and divorce.[38] When an individual debtor files his or her petition for relief, they place all their assets before the bankruptcy court. They will take no more from

bankruptcy than Congress has determined they are entitled to take, both in regard to debt relief, *see, e.g.*, §§ 523, 524, 727, 1324, and exemption entitlements, *see* § 522.[39]

Views such as those expressed in *Roberge* are borne in subjective notions of what is "right" and "fair." They are understandable, but they do not comport with the law as written. Where the legislature has addressed the interaction of bankruptcy and divorce, it is not for judges to say that it is inappropriate that they interact.

The fact of the matter is that bankruptcy can, and often does, intervene during and after divorce to complicate matters. It can make an unhappy situation even sadder. And when it comes to the *financial* terms of marital dissolution, the situation is not unlike a commercial negotiation. Informed counsel must deal with the potential for, and consequences of, a bankruptcy filing at every turn. Where, as here, finances were *in extremis*, competent representation for Cox virtually compelled his counsel to raise bankruptcy's specter. Cox's advocates fairly could attempt to gain leverage by explaining their view of how bankruptcy would alter rights, urging Davis to concede points that bankruptcy would otherwise take away. That is exactly what happened here.[40]

As I previously remarked, the real rub here comes from the polar opposite views

jectory, the fruits of victory will likely be ashes in the mouth of the victor.
Decision & Interim Order, Stip. Ex. F at 2–3, 6–7.

**36.** At the same time, however, the *Roberge* court noted that the Bankruptcy Code "consistently tries to protect families and preserve the marital residence." *Id.*

**37.** As explained above, *supra* note 25, *Roberge* involved a debtor who had manipulated jurisdiction among two state courts and the bankruptcy court. Thus, the case can fairly be

read in a fashion far more limited than its sweeping language.

**38.** *Supra* note 17.

**39.** Through the "opt out" provision of § 522(b)(1), Congress has provided the states themselves with the definitive say in this regard.

**40.** This point should not be taken as approving Cox's contumacious conduct or dismissing the possibility that he may have imperfectly met his obligations in bankruptcy.

counsel held regarding what Cox's bankruptcy might mean for Davis. That is understandable. Most of what today's decision determines is a matter of first impression in this district.

### V. A Final Detour

Having gone this far, I could quit. But a couple of final remarks are in order.

First, although today's result may trouble some at first, it is compelled by applicable law. Today's holding honors and applies Maine law. To hold otherwise would dishonor and distort it. Second, when one steps outside the bilateral relations of divorcing spouses and, instead, looks at the divorce dynamic through the eyes of the rest of the world, the result is sensible. Few would opt for a legal environment where, once a divorce complaint is filed, those who deal with either spouse would, without notice, risk that their expectations would be upset by a subsequent equitable distribution order. Third, within the bilateral relationship, there are ways to mitigate harshness. During divorce, interlocutory remedies (*e.g.*, attachment) can be employed. And before divorce is even contemplated the very way married couples title their property can help assure their expectations if and when divorce ensues.[41] Fourth, lawmakers might always rework schemes in need of repair through legislative action. Indeed, the protections afforded to both Cox and Davis here are largely the creature of statute.

And fifth, on another note altogether, I am well aware that today's decision might be seen as destructive of comity between state and federal courts. On that point, I differ. It is this court's fundamental responsibility to speak and apply the law. Vague notions of comity cannot override

that charge. Moreover, today's result speaks no disrespect for the state court. The state court judge and case management officer undertook and completed Herculean tasks. Their work was completed with Cox's bankruptcy underway. Bankruptcy changes things, and it became this court's job to determine how bankruptcy affected the provisions of the divorce decree at issue here. That job is done.

### Conclusion

For the reasons set forth above:

1. Relief will not be granted for Davis to enforce the state court's $65,250.00 award against the Advest IRA and the Fleet IRA;

2. If the IRA's are not determined to be fully exempt, Cox will have to demonstrate standing to contest Howison's proposed disposition of any nonexempt portions;

3. Relief from stay will be granted to permit collection of the *guardian ad litem's* fees from the IRA's;

4. I will reserve ruling on disposition of the Amcor partnership interest unless, within 20 days, Cox files papers demonstrating he has standing to contest the asset's distribution; provided, however, that should Cox fail to demonstrate standing within the twenty day period, the trustee may takes such steps to dispose of or distribute that asset as he sees fit without further objection by Cox;

5. Relief from stay will issue to permit distribution of the Lawrason Escrow Account and the Beagle & Ridge Escrow Account in accordance with the state court decree's dictates; and

---

41. I realize the opportunity to structure ownership protectively is less apparent when IRA's are involved, but these remarks are

outside the margin of today's decision anyway.

6. The parties' respective rights to the assets that are the subject of this decision are as declared above.